## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JING ZHOU,

      *Plaintiff*,

  v.

KRISTI NOEM, *Secretary U.S. Department of Homeland Security*, et al.,

      *Defendants*.

Civil Action No. 19-2650 (TJK)

### <u>MEMORANDUM OPINION</u>

Through a program known as EB-5, Congress chose to allot visas to foreign citizens who invest in American businesses and create jobs for U.S. workers. To qualify, the immigrant must invest a substantial amount of "capital" that she "lawfully obtained." Jing Zhou is a Chinese national who received over three million Chinese Yuan from her husband and sought to invest that money in a Wisconsin-based redevelopment fund. But Chinese currency laws limit citizens' exchanges for U.S. Dollars to $50,000 per year, making it nearly impossible for a prospective investor to transfer enough funds to the United States on her own. Yet there are ways to get around that problem. Some investors transfer their money to family members or friends who convert the funds to U.S. Dollars; others use third parties in Hong Kong who transfer Hong Kong-based funds to the investor's account after the investor deposits the original funds in the third-party's account. Zhou did both.

The U.S. Citizenship and Immigration Service, which administers the EB-5 program, denied Zhou's visa petition because she failed to establish that a Hong Kong-based currency exchanger (and family friend) obtained his U.S. Dollars from a lawful source. Zhou sues to challenge the denial, arguing the governing regulation requires her to show only that she lawfully obtained

her own "capital," *i.e.*, the Chinese Yuan-denominated funds her husband earned and gave her. USCIS's requirement that she also prove where the *U.S. Dollars* came from, she contends, goes beyond what the text of the regulation requires. Both Zhou and USCIS cross-move for summary judgment. Because the Court finds that USCIS's denial was arbitrary and capricious, it will grant Zhou's motion in part and deny USCIS's cross-motion.

## I.    Background

### A.    The EB-5 Immigrant Investor Program

In 1990, Congress amended the Immigration and Nationality Act ("INA") to establish the EB-5 Immigrant Investor Program, which provides "employment creation" visas to aspiring immigrants who make qualifying investments in U.S. commercial projects. *Huashan Zhang v. USCIS*, 978 F.3d 1314, 1316 (D.C. Cir. 2020) (citing 8 U.S.C. § 1153(b)(5)). To qualify for an EB-5 visa, an individual must invest at least $1,000,000 of "capital" into a new, restructured, or expanded business or commercial project in the United States, and that investment must create at least ten full-time jobs for U.S. workers. 8 U.S.C. § 1153(b)(5)(A)(i), (C)(i). A lesser amount— $500,000 when Zhou filed her petition—is required if the individual invests "in a targeted employment area," *i.e.*, an "area designated by the Secretary of Homeland Security . . . as a high unemployment area." *Id.* § 1153(b)(5)(C)(ii), (D)(viii).[1] An individual, or "petitioner," who meets the INA's requirements may file a Form I-526 petition, the approval of which allows her to apply for an EB-5 visa. *See id.* § 1202(a); 8 C.F.R. § 204.6(a). She thereby obtains status as a legal U.S. resident on a conditional basis, along with her spouse and children. *See* 8 U.S.C. § 1186b(a)(1). After two years, a petitioner seeking permanent resident status may submit a Form I-829 petition

---

[1] For petitions filed on or after March 15, 2022, the minimum investment amount is $1,050,000 generally and $800,000 for targeted employment areas. *See* EB-5 Reform and Integrity Act of 2022, Pub. L. No. 117-103, 136 Stat. 1070, 1072.

to USCIS to show that she has satisfied all capital-investment and job-creation requirements of the program.  *See* 8 C.F.R. § 216.6(c).

Beyond these general eligibility criteria, the EB-5 investor must meet specific requirements set out by statute and in regulations promulgated by the Department of Homeland Security ("DHS").[2]  To "invest" in a new commercial enterprise ("NCE"), the petitioner must "contribute capital."  8 C.F.R. § 204.6(e).  "Capital," in turn, means "cash and all real, personal, or mixed tangible assets owned or controlled by the alien investor . . . ."  8 U.S.C. § 1153(b)(5)(D)(ii)(I); *see* 8 C.F.R. § 204.6(e) (similar).  But the regulation excludes from the definition of "capital" any "[a]ssets acquired, directly or indirectly, by unlawful means (such as criminal activities)."  8 C.F.R. § 204.6(e).  "To show that the petitioner has invested . . . capital obtained through lawful means," she must provide, as applicable, "foreign business registration records," "corporate . . . and personal tax returns," "[e]vidence identifying any other source[s] of capital," and "copies of any judgments or evidence of all pending governmental . . . actions, governmental administrative proceedings, and any private civil actions . . . involving monetary judgments against the petitioner" within the specified timeframe.  8 C.F.R. § 204.6(j)(3).

## B.    Zhou's Petition for an EB-5 Visa

In June 2015, Zhou filed an I-526 petition for EB-5 visas for herself, her husband, and two daughters—all of whom, like Zhou, are Chinese nationals.  *See* Certified Administrative Record ("CAR") 6.  Zhou asserted her eligibility under the EB-5 program based on her $500,000 investment into Blue Ribbon Development Fund IV, LLC, an NCE mainly doing business within a targeted employment area.  CAR 6–7.  The NCE proposed to pool $30 million and invest the entire

---

[2] When Zhou filed her petition, the INA left "capital" and other key terms undefined.  That changed when Congress passed the EB-5 Reform and Integrity Act of 2022.  *See* 136 Stat. at 1072–74.

amount in a redevelopment project, which would convert a historical building into a mixed-use building in Milwaukee, Wisconsin.  CAR 862.

Zhou acquired her EB-5 investment capital from her spouse, Jiemin Liu, who in turn earned the money from his employment at a technology company from 1996 to 2012.  CAR 863–65. Zhou submitted records to that effect, including a common-property declaration as well as her husband's statement of income source, statement of fund accumulation, annual salary certificates, and tax-payment certificates covering multiple years.  CAR 863–64.[3]  These documents show that Liu earned a total annual salary of RMB 3,240,300 from 2007 to 2011 and received RMB 15,209,700 in dividends.  CAR 865.  (The Renminbi is also known as the Yuan.)

But China's currency-exchange regulations cap the Yuan that mainland Chinese residents can convert into U.S. Dollars at $50,000 each year (or its equivalent in other currencies).  *See* CAR 866; *see also* Bernadette Lee, *China's Capital Controls: Here to Stay?*, Central Banking (July 30, 2021), https://perma.cc/YRW9-K7CR.  Thus, Chinese investors commonly use third-party individuals or currency-exchange businesses to convert their Chinese currency to U.S. Dollars.  *See* Ali Brodie, *EB-5 Investor Basics: Overview of Countries with Currency Restrictions*, eb5investors.com (January 21, 2014), https://perma.cc/T3MY-QHTV.

Zhou did just that.  Between May 2011 and May 2012, she used the services of three individuals to exchange a total of RMB 3,414,952.39 for $540,125.50.  CAR 866.  Most of Zhou's funds—RMB 1,901,510—were converted into U.S. Dollars—$300,975.50—by Wenyuan Wu, a third-party exchanger and family friend.  *See* CAR 866, 649.  Along with the documents already

---

[3] Zhou also submitted her husband's Bank of China account statement for January 1, 2009, to June 14, 2013; her husband's Bank of Communications account statement for January 1, 2011, to December 31, 2012; her own bank statements for three accounts; and certain financial product transaction records.  *See* CAR 863–64 (listing items in initial record).

noted, Zhou also submitted currency-exchange statements and documents tracing the path of funds for each exchange. CAR 864–65. As to Wu specifically, she provided a currency-exchange statement; a copy of Wu's ID; an escrow agreement; and records documenting both the transfer of RMB-denominated funds from her Bank of China account to Wu's China Merchants Bank account on May 11, 2012, and the receipt of USD-denominated funds from Wu's Hong Kong bank account to her husband's Hong Kong account six days later. CAR 865–66.[4]

For about three years, USCIS took no action on Zhou's petition. In September 2018, USCIS denied it for abandonment. CAR 585–86. That denial, the agency later admitted, was erroneously based on Zhou's purported failure to respond to a request for evidence about the lawful source of Wu's funds. CAR 566, 585–86, 626–27. Zhou, however, never received that request. *See* CAR 620. After USCIS rejected her appeal from the denial, Zhou sued. *See* ECF No. 1; CAR 622–28. USCIS promptly revisited its decision, acknowledged its error, and reopened the I-526 petition. CAR 626–27. It resumed its inquiry into the lawful source of Zhou's investment funds by requesting information about the source of Wu's funds and her husband's employment. CAR 630–38.[5] In the agency's view, the evidence did not establish that her capital was obtained through lawful means in part because she did not show the source of Wu's funds or prove that Wu was a licensed money exchanger. CAR 630-47, 649.[6]

---

[4] Hong Kong's currency control and banking regulations are less restrictive than mainland China's. CAR 866 n.3.

[5] The lawful source of Zhou's husband's funds appears to have been resolved to USCIS's satisfaction after Zhou responded to the request for evidence and so was not a basis for the denial of Zhou's petition. The Court will limit its discussion of that evidence accordingly.

[6] As Zhou points out, USCIS asked no questions about the source of U.S. Dollars held by the other two individuals through whom she exchanged her investment funds. *See* ECF No. 28 at 11.

In response, Zhou objected to the agency's inquiry into the source of Wu's funds, arguing it was beyond what the regulation allowed—just whether Zhou obtained her capital lawfully. CAR 649. Zhou met her burden, she maintained, by showing the lawful source of her funds: the RMB 3,400,000 her husband earned through his employment at Huawei. CAR 650. Still, she made a "good faith effort" to provide additional information to show that Wu's funds derived from lawful means: his employment at two companies, Shenzhen Renhe Overseas Co., Ltd., where he earned RMB 4.5 million ($693,000) between 2009 and 2011, and Kindness International Group (Hong Kong), where he earned HKD 800,000 ($102,000) a year starting in 2011. CAR 649–50; 868–89. Zhou provided work and income certificates from both employers. CAR 649–50; 869. In the three years before the currency exchange, Wu earned income totaling over $700,000 and maintained a multi-currency savings account from 2005 to 2016. CAR 650. He obtained a bank reference statement certifying as much. *See* CAR 685, 869. In an affidavit, Wu explained that he closed his account in 2016 and could not provide records from before 2013. CAR 672 ("I was told by the bank that because my account was closed they no longer keep my account records long time ago."). But, "to assist [Zhou]," he provided "some of the records to which he ha[d] access," namely from January 2013 to December 2014. CAR 650.

In May 2020, USCIS denied Zhou's petition for failing to show she obtained her invested capital through lawful means. CAR 858–72. Although she "establish[ed] the source of [her] EB-5 investment" as "her spouse," who in turn derived those funds from his employment, CAR 865, USCIS found she failed to establish the lawful source of *Wu's* funds. To show that the "capital was . . . her own and was obtained through lawful means," the agency explained, Zhou had to "document the path of funds." CAR 869 (citing *Matter of Izummi*, 22 I. & N. Dec. 169, 195 (BIA 1998)). But on its account, Zhou "did not provide sufficient evidence to establish the source of

Mr. Wu's USD $300,975.50 that he sent to [Zhou's husband], and which [Zhou] ultimately used to make her claimed investment into the NCE." CAR 867. Specifically, the record did not show "that Mr. Wu received and retained the claimed income from both companies." CAR 869; *see also* CAR 870–71. "Bank letters or statements corroborating the deposit of funds by themselves are insufficient," the agency reasoned, as "[t]he record must trace the path of the funds back to a lawful source." CAR at 867. (first citing *Matter of Ho*, 22 I. & N. Dec. 206, 210–11 (BIA 1998), and then citing *Izummi*, 22 I. & N. at 195). Zhou likewise "did [not] provide evidence, such as licensing and registration documents, to demonstrate the legitimacy of Mr. Wu's operations as a licensed money exchanger." CAR 867; *see also* CAR 869. The agency also noted that Wu's claim that his bank "no longer ke[pt] [his] records" was not supported by the bank's reference letter, which said only that his account was closed in 2016 but "did not indicate that the evidence was unavailable." CAR 870.

### C.    Procedural History

Zhou filed this lawsuit challenging USCIS's initial denial of her I-526 petition in September 2019. ECF No. 1. She amended her complaint a year later following the agency's final denial. ECF No. 16 ("Am. Compl."). She brings two claims under the Administrative Procedure Act ("APA"). First, she alleges that USCIS arbitrarily and capriciously denied her petition based on her failure to show the lawful source of Wu's funds because its interpretation of 8 C.F.R. § 204.6 was erroneous and inconsistent with its own precedent. Am. Compl. ¶¶ 77, 84–93, 106–09; *see also* ECF No. 24 at 16–28. Second, Zhou contends that USCIS's new policy of scrutinizing the funds of third-party money-exchangers is a legislative rule adopted without notice-and-comment rulemaking and applied retroactively to her petition. Am. Compl. ¶¶ 94–100, 110; *see also* ECF No. 24 at 28–31.

The parties' cross-motions for summary judgment were ripe for review by May 2021. But

the Court stayed the case in September 2021 when the parties indicated that Congress had not extended the statutory authorization for the Regional Center Program under which Zhou sought to qualify for a visa.[7]  ECF No. 32; Minute Order of September 24, 2021.  Congress reauthorized issuance of EB-5 visas under that program in 2022.  *See* EB-5 Reform and Integrity Act of 2022, Pub. L. No. 117-103, 136 Stat. 1070, 1075 (2022) (providing that "[v]isas under [the Regional Center Program] shall be made available through September 30, 2027").  The Court then lifted the stay.

## II.    Legal Standard

Although both parties move for summary judgment, the ordinary summary-judgment standard does not apply.  Plaintiff "seeks review of agency action under the APA," so the Court "sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  That is, the Court has no factfinding role because the case presents "a question of law." *See id.*  It must ask "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013).  On top of its purely procedural requirements, the APA directs courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

When evaluating a claim that agency action is arbitrary or capricious, courts must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009) (quotation omitted).  That

---

[7] Under the Regional Center Program, EB-5 petitioners "pool[] their investments with 1 or more qualified immigrants" into "a regional center in the United States, which has been designated by the Secretary of Homeland Security on the basis of a proposal for the promotion of economic growth, including prospective job creation and increased domestic capital investment."  8 U.S.C. § 1153(b)(5)(E)(i).

standard does not empower a court to "substitute its judgment for that of the agency." *Id.* (quotation omitted). In other words, the agency's "policy choices" are not up for debate—only the "explanation it has given." *Id.* at 530. That explanation must include a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).

"The Court's review, however, must be 'searching and careful.'" *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting *Nat'l Env't Dev. Ass'n Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012)). "An agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Courts must give "substantial deference" to an agency's "interpretation of its own regulations, unless the agency's interpretation is plainly erroneous or inconsistent with the regulation." *City of Oswego v. FERC*, 97 F.3d 1490, 1498 (D.C. Cir. 1996) (citation and internal quotation marks omitted). But this deferential standard applies only "if the regulation in question is 'genuinely ambiguous' and if the agency's reading is reasonable." *Doe v. SEC*, 28 F.4th 1306, 1311 (D.C. Cir. 2022) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019)). When deference is unwarranted—that is, when the regulation is not ambiguous—the agency's reading has but the "power to persuade." *Kisor*, 588 U.S. at 573 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159(2012)).

## III.    Analysis

The Court finds that Zhou is entitled to summary judgment on her arbitrary-and-capricious

claim because USCIS denied her petition based on an interpretation of the regulation that requires more than its text requires. Thus, it need not address Zhou's other argument that the agency's denial flowed from a legislative rule requiring notice-and-comment rulemaking.

### A.    The Agency's Action was Arbitrary and Capricious

Under 8 C.F.R. § 204.6(j), a petitioner must submit evidence showing that her investment "capital" was "lawfully obtained." And § 204.6(e) excludes from the definition of "capital" any "[a]ssets acquired, directly or indirectly, by unlawful means (such as criminal activities)." The nub of the parties' dispute is whether those regulatory provisions require Zhou to establish that Wu, the third-party currency exchanger, lawfully acquired the U.S. Dollars he eventually gave to Zhou.

Zhou argues USCIS's inquiry into the lawful source of Wu's funds contradicts the plain language of 8 C.F.R. § 204.6(e) and (j), as these provisions "are unambiguously concerned with the origin of the capital"—that is, the initial acquisition of the value contributed to the NCE. ECF No. 24 at 17. She contends she derived *her* capital—denominated in Chinese currency—from her husband's income, *id.* at 18, and neither the source nor her ownership of that capital changed when she swapped her funds for U.S. Dollars—only its medium did, *id.* at 18–19. So, she asserts, any inquiry into the source of Wu's funds was beyond the agency's purview. USCIS, too, believes the regulations "are clear" insofar as they require that "funds invested into the United States must be lawfully sourced." ECF No. 26 at 14. On its account, the regulation requires proof of the "source" and "path" of investment funds, and Zhou did not show that the money she "actually invested" in the NCE—the U.S. Dollars that came from a third-party individual—was lawfully obtained by Wu. *Id.* at 15; ECF No. 30 at 3.

As explained below, the Court finds that neither position is exactly right. On the one hand, the regulation is not as narrowly focused on an investor's "capital," as Zhou suggests. The "assets"

that make up the capital must also be lawfully obtained.  But, on the other hand, even assuming

Zhou acquired a new "asset" when she obtained U.S. Dollars from Wu, the regulation only requires

Zhou to show that *she* acquired that asset lawfully; it does not require her to independently estab-

lish how *Wu* obtained *his* funds.  Because USCIS based its decision on an interpretation that "con-

flicts with the language of the regulation," its decision was arbitrary and capricious.  *Siqing Wang*

*v. USCIS*, 366 F. Supp. 3d 118, 124 (D.D.C. 2019); *see also Chiayu Chang v. USCIS*, 289 F. Supp.

3d 177, 188 (D.D.C. 2018) (holding denial of petition was arbitrary and capricious where USCIS's

action "conflict[ed] with the plain language of its regulations," "unreasonably stretch[ed] the ra-

tionale of [BIA precedent]" and ran "counter to the evidence in the record").

### 1.    USCIS's Inquiry Into the Source of Third-Party Funds Is Inconsistent with the Language of the Regulation

To repeat, a foreign investor seeking an EB-5 visa must provide evidence to establish that

she "has invested . . . lawfully obtained capital in a new commercial enterprise in the United

States."  8 C.F.R. § 204.6(j).  The regulation defines "capital" as follows:

> Capital means cash, equipment, inventory, other tangible property, cash equiva-
> lents, and indebtedness secured by assets owned by the alien investor, provided that
> the alien investor is personally and primarily liable and that the assets of the new
> commercial enterprise upon which the petition is based are not used to secure any
> of the indebtedness. All capital shall be valued at fair market value in United States
> dollars. Assets acquired, directly or indirectly, by unlawful means (such as criminal
> activities) shall not be considered capital for the purposes of section 203(b)(5) of
> the Act.

8 C.F.R. § 204.6(e).  "Capital" is thus an umbrella term that refers to various liquid and fixed assets

representing an individual's financial position.  In this way, the regulatory definition tracks how

the term is defined elsewhere: a "measurement of wealth" referring to the "value" of "financial

assets" that can be used for "investment purposes."  Marshall Hargrave, Caitlin Clark & Yarilet

Perez, *Capital: Definition, How It's Used, Structure, and Types of Business*, Investopedia,

https://perma.cc/G7PD-RBAB (last updated July 11, 2024); *see also Capital*, Oxford English

Dictionary (September 2024) ("capital" means "[r]eal or financial assets possessing a monetary value"; "the total sum of shareholders' contributions . . ."; "accumulated wealth").

Here, Zhou's "capital" was cash on hand—money she got from her husband. *See* CAR 865. If all the regulation required was that an EB-5 investor show she "invested . . . lawfully obtained capital," 8 C.F.R. § 204.6(j), then Zhou would be correct that she need only prove she lawfully obtained her Yuan-denominated funds. That is so because she did not obtain any new "capital" when she exchanged her Chinese Yuan for U.S. Dollars. She converted cash that she owned from one denomination to another; so long as she did so at the prevailing exchange rate (and USCIS has not suggested otherwise), the exchange did not increase her wealth or the value of her financial assets. So, in that case, any inquiry into the lawful source of U.S. Dollars would appear to be off-limits.

But Zhou ignores that § 204.6(e) carves out "[a]ssets acquired . . . by unlawful means" from the definition of "capital." USCIS reads that phrase to mean "that funds invested into the United States must be lawfully sourced," and that Zhou thus had to provide evidence to that effect. ECF No. 26 at 14. The Court agrees the phrase suggests a petitioner must prove that the assets which make up her capital were lawfully obtained by her. Still, whether Zhou had to show she lawfully obtained the U.S. Dollars, and not merely the Chinese Yuan, depends on whether she indeed "acquired" an "asset" by exchanging her funds from one currency to another. USCIS appears to assume as much without explaining why. Because the Court finds for Zhou despite this USCIS-favorable assumption (and because the parties did not brief this issue), it will assume that Zhou acquired an "asset" through the currency exchange, even though she did not obtain any new "capital" from Wu. So the Court assumes that, to qualify for an EB-5 visa, she had to show not only that her Yuan were "lawfully obtained" but that her U.S. Dollars were too.

The Court's agreement with USCIS ends here, however, because the regulation focuses on the lawfulness of the petitioner's actions in acquiring her investment funds. By requiring that the assets be "*acquired*" through "[]lawful *means*," the regulation asks only whether the "course of action [Zhou] employed to attain some object"—here, "gain[ing] possession of" U.S. Dollars—was "permitted by law." *Mean*, Oxford English Dictionary (September 2024); *Acquire*, Oxford English Dictionary (September 2024); *Lawful*, Oxford English Dictionary (September 2024). Simply put, the regulation requires only that Zhou show *she* got her U.S. Dollars lawfully. Yet USCIS denied Zhou's petition for failing to show that *Wu* obtained his U.S. Dollars from a lawful source. *See* CAR 866–67.

USCIS never engages with that distinction. Instead, it cites the definition of "capital" in § 204.6(e) and cursorily contends that it makes "clear that funds invested into the United States must be lawfully sourced." ECF No. 26 at 14. But USCIS never defends or even explains its apparent assumption that the regulation requires that Wu, not just Zhou, lawfully obtained the assets involved. True, the specific part of § 204.6(e) at issue is phrased in the passive voice without reference to a specific actor; that is, it says nothing explicit about whose "[a]ssets" must be "acquired . . . by []lawful means." But taken as a whole, the regulation focuses on the *investor* and his or her assets, meaning Zhou need only show how she obtained her funds (whether Yuan or U.S. Dollars)—not how Wu obtained his.

Right off the bat, the same provision on which USCIS relies defines capital as "cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by ***assets owned by the alien investor*** . . . ." 8 C.F.R. § 204.6(e) (emphasis added). Next, § 204.6(j) outlines the "evidence" a petitioner must submit, if applicable, with her petition. To "show" that she "invested . . . capital obtained through lawful means," under the regulation, "[t]he ***petitioner may be***

***required*** to submit" information such as:

> (i) Foreign business registration records;
>
> (ii) Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this subpart), and ***personal tax returns*** including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States ***by or on behalf of the petitioner***;
>
> (iii) Evidence identifying any other source(s) of capital; or
>
> (iv) Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments ***against the petitioner*** from any court in or outside the United States within the past fifteen years.

8 C.F.R. § 204.6(j), (j)(3) (emphases added). These types of evidence focus on the petitioner: documents in her possession reflecting her transactions. The regulation's omission of other types of evidence suggests that non-petitioner-focused evidence would not help the key inquiry about the lawful source of the funds.

Another part of the regulation, § 204.6(g), drives that point home. It is only when "multiple investors" establish a new NCE that "the source(s) of all capital invested [must be] identified" and "derived by lawful means," even that of persons who "are not seeking" an EB-5 visa. *Id.* § 204.6(g). In other words, the only time the regulation requires proof of "the source[]" of "capital" of a person who is *not* a petitioning investor is when that person contributes his own capital to the NCE. But an individual (or entity) who merely converts one currency for another does not obtain a stake in the enterprise in which the funds are invested. In USCIS's own words, someone like Wu simply "facilitates the transfer of funds"; he does not contribute capital. ECF No. 26 at 17. So § 204.6(g) does not support USCIS's view that "an individual who gives funds to an investor based on a currency swap must account for the source of [those] funds." ECF No. 26 at 15–

16 (citing § 204.6(g)). Again, that provision does not permit USCIS to inquire into the lawful source of funds held by individuals who do not invest their own capital.[8]

In addition, the practical implications that would attach to USCIS's expanded interpretation make it implausible. First, suppose Zhou exchanged her Chinese Yuan not through an individual currency exchanger but through a Hong Kong-based bank. The U.S. Dollars would derive from the bank's cash reserve, which in turn likely has multiple sources. In that context, it makes no sense to inquire into the origin of the U.S. Dollars held by the bank. The fungibility of money would make tracing those funds nearly impossible, so there would be no way of knowing where the U.S. Dollars put up by Zhou came from. Second, transforming § 204.6(e) and (j)(3) from a narrow inquiry focused on the petitioner's acquisition of her investment funds into a requirement that she prove the lawful actions of someone who once held those assets—here, Wu—means she could have to trace her U.S. Dollars back indefinitely. In other words, the interpretation admits of no limiting principle. If the regulation is read to require Zhou to show that Wu acquired his U.S. Dollars by lawful means, there is no textual roadblock preventing USCIS from *also* requiring her to show that Wu's employers obtained their funds by lawful means. After all, the "asset" could have been unlawfully acquired at any time. How a petitioner could ever bear that evidentiary burden is unclear.

In concluding that USCIS's inquiry into the source of third-party funds—at least on this

---

[8] To support its interpretation, USCIS cites the Senate Report accompanying the Immigration Act of 1990, by which Congress established the EB-5 program. *See* ECF No. 26 at 16–17. But, if anything, the language it quotes is icing on the Court's cake: "[T]he committee intends that processing of an individual visa not continue . . . if it becomes known to the Government that the money invested was *obtained by the alien* through other than legal means (such as money received through the sale of illegal drugs)." S. Rep. No. 101-55, at 21 (1989) (emphasis added).

record—conflicts with the regulation, the Court is not venturing onto entirely new ground.[9]  In

*Battineni v. Mayorkas*, another court in this District held that "the inquiry is intended to focus

solely on a petitioner's <u>immediate</u> source of funds, <u>not</u> an individual's or entity's source of funds

at some earlier point in time."  No. 22-cv-1332 (PLF), 2024 WL 4367522, at *9 (D.D.C. Oct. 2,

2024) (emphasis in original).  There, the petitioners received their investment funds from the sale

of a company they co-founded with the help of a loan from another individual.  *Id.* at *2.   One

petitioner submitted documents relating to the sale of the company and third-party loan, including

a photocopy of the check from the lender with the words "hand loan" written on it, information

about the lender's employment and salary, and a letter from the lender confirming that, "while

there was no written loan agreement," he indeed loaned the petitioner money using funds in his

Wells Fargo account and was repaid the same year.  *Id.* at *3.  The lender even submitted bank

statements from his Wells Fargo account.  *Id.*  Nonetheless, USCIS denied the petition because the

EB-5 investor failed to establish he invested lawfully obtained capital, as the evidence "did not

show the source of" deposits made into the *lender's* bank account.  *Id.*  That is, the petitioner "did

not trace the loan funds from [the lender] to a lawful source."  *Id.*

   But in that court's view, USCIS went too far.  It rejected the agency's argument that "a

---

[9] Still, it appears that this is the first time a court in this District has ruled on the propriety of USCIS's inquiry into the funds of a currency-exchanger, although one court came close to doing so.  In *Truong v. USCIS*, the petitioner also engaged in a currency swap by transferring Vietnamese đồng to a company's Vietnamese affiliate, and that company in turn transferred the funds from its bank account in Singapore to the NCE in the United States.  No. 21-cv-316 (RC), 2023 WL 4234658, at *2 (D.D.C. June 28, 2023).  USCIS denied her petition in part for insufficiently documenting the lawfulness of the currency exchanger's funds.  *See id.* at *4.  But Judge Contreras did not "address the parties' arguments regarding USCIS's examination of the lawfulness of third-party currency exchanger's funds," *id.* at *5, instead granting summary judgment to USCIS because the petitioner failed to prove the "path of [her] funds," *id.* at *7.  The administrative record showed, for instance, that the petitioner "did not provide any documents such as bank statements to confirm [the currency exchanger] actually received the VND funds in its business accounts in Vietnam."  *Id.*

petitioner must not only show that he . . . obtained the EB-5 investment funds from a lawful source," but also that he "trace" those funds "beyond his . . . immediate source." *Battineni*, 2024 WL 4367522, at \*8. The agency's "path of funds" requirement, the court explained, was "unsupported by" § 204.6(e) and (j)(3), as neither "alludes to a specific requirement to 'trace every penny' of the EB-5 investment funds beyond a petitioner's immediate source of funds." *Id.* at \*9. In the court's view, the regulation's inquiry is a "narrow" one requiring "a petitioner to 'show' that [his] funds were obtained from a lawful source." *Id.* at \*9, \*12. Anything "beyond the[] initial acquisition" of funds by the petitioner is off-limits: the regulation does not require any "evidence of where" other "person[s] or entit[ies]" obtain *their* funds. *Id.* at \*12. So the court found that the agency acted arbitrarily and capriciously by denying the petition for failing "to provide evidence of where [the lender] obtained the funds he lent to [the petitioner]." *Id.*; *see id.* at \*14. "All" he had to show was that the lender himself was a "lawful source[] of the funds." *Id.* at \*12. *Battineni* fits this case to a tee. USCIS's insistence that Zhou show that Wu obtained his money lawfully is premised on the same "incorrect interpretation of the applicable regulations." *Id.*

### 2.  USCIS Denied Zhou's Petition Based on an Incorrect Reading of the Regulation

USCIS acted arbitrarily and capriciously in concluding that, because Zhou did not "establish the source of Mr. Wu's USD $300,975.50 that he sent to [her]," she "failed to establish that [the] funds [she] invested" were "derived" lawfully. CAR 867. Again, the Court assumes that Zhou had to provide evidence to show she obtained two types of funds by lawful means: (1) the Chinese Yuan, *i.e.*, her "capital," and (2) the U.S. Dollars she invested in the NCE, *i.e.*, the "asset" she acquired through the currency exchange.

USCIS does not appear to suggest that Zhou did not clear the first bar. As USCIS explained in its final decision, she submitted "evidence that establishe[d] the source of [her] EB-5 investment

was her spouse, Jiemin LUI," CAR 865, and USCIS did not quibble with the legality of that trans-

action in denying the petition.  Nor does the Court understand the agency to press that argument

now.[10]  And, as far as the Court can tell, USCIS does not contend that Zhou failed to clear the

second bar either.  To show that she lawfully obtained her funds, she provided evidence in the

form of income- and fund-accumulation statements, income tax payment certificates, and bank-

communication statements documenting how she obtained the $300,975.50 in exchange for her

RMB 1,901,510.  She also traced the transfer of her Chinese Yuan from their point of origin (her

husband) to their investment in the NCE by providing, among others, a currency exchange state-

ment and documents recording the transfer of her Yuan-denominated funds to Wu and the return

of USD-denominated funds from Wu to her.  *See* CAR 863–66.  Indeed, the escrow agreement

avoided what USCIS claims happened here—that the currency-exchange detour "broke the path

of funds," ECF No. 26 at 15—as the agreement tracks the flow of funds by detailing, among others,

the timing and other conditions for their release.[11]  That appears to negate the notion that the EB-

5 investment funds came out of nowhere, which was the issue in the cases USCIS cited to support

its reasoning.  *See* CAR 863 (explaining that "[t]he record must trace the path of the funds back to

a lawful source" and citing *Matter of Ho*, 22 I. & N. Dec. at 210–11, and *Matter of Izummi*, 22 I.

---

[10] At one point, USCIS contends that Zhou has no "support" for "her suggestion that it was undisputed that the invested funds came from her husband's income."  ECF No. 30 at 3.  But in doing so, USCIS does not appear to contest that Zhou got her Chinese Yuan from her husband or challenge the lawfulness of *that* transaction.  Rather, USCIS appears to defend its view that the "invested funds" that must be lawfully obtained are the U.S. Dollars that came from Wu.

[11] *See, e.g.*, James Chen, *What Is an Escrow Agreement? How it Works, Uses, and Types*, Investopedia, https://perma.cc/Z5T9-GLYR (last modified Jan. 13, 2021); *Escrow Agreement*, Corporate Finance Institute, https://perma.cc/5YQX-JN7A.

& N. Dec. at 195).[12]

Despite Zhou's submissions showing how her Yuan were exchanged for U.S. Dollars and wound up in the NCE, USCIS concluded that Zhou "failed to demonstrate by a preponderance of the evidence" that the funds she invested in the NCE were "lawfully derived." CAR 867. But it did not, for example, contend that Zhou did anything illegal by bypassing Chinese currency exchange laws or otherwise focus on *Zhou's* actions in obtaining her funds.[13] *See* CAR 866 n.3 (recognizing the more relaxed currency laws in Hong Kong). Rather, it reasoned that Zhou provided "[in]sufficient documentary evidence to corroborate claims that Mr. Wu lawfully earned" the claimed income from the companies that employed him "and accumulated/maintained" those funds. CAR 867, 869. In other words, it found that Zhou failed to prove that Wu acquired *his*

---

[12] In *Matter of Ho*, the petitioner submitted evidence suggesting his funds were "transferred from an unidentified bank account" to an NCE in California. 22 I. & N. Dec. at 209. And because the "wire-transfer receipt d[id] not reveal from what bank account(s) the funds originated," he could not establish that "the source of the funds transferred to the [NCE]" belonged to him. *Id.* at 211. Missing there, then, was a link connecting the funds deposited with the NCE to the investor's own capital. The BIA called that evidentiary requirement the "path of . . . funds" in *Matter of Izummi*. 22 I. & N. Dec. at 195. There, too, the petitioner submitted evidence showing receipt of investment funds in the United States, but "the record d[id] not reveal from where these funds originated." *Id.* By failing to "document[] the path of the funds, such as by wire-transfer records," the BIA explained, the petitioner could not establish the funds transferred to the NCE "were his own funds." *Id.*

[13] That said, in denying Zhou's petition, USCIS also commented that Zhou "did not provide evidence, such as licensing and registration documents, to demonstrate the legitimacy of Mr. Wu's operations as a licensed money exchanger" or "as a broker." CAR 867, 869. The agency may consider on remand whether, given China's stringent currency-exchange laws, the use of unlicensed currency exchangers renders Zhou's acquisition of U.S. Dollars unlawful in some way, but to repeat, it has not made that argument here. To the contrary, although USCIS asserts that it "has a long history of questioning the role of non-licensed third parties that transfer funds with no identifiable connection or relationship to the petitioner," ECF No. 26 at 17 n.2, the two cases it cites do not appear to get USCIS far here. In both, the Administrative Appeals Office pointed out that the petitioners had not provided information about their "*relationship*" to the third party that helped facilitate the transfer of funds—a deficiency far afield from what USCIS focused on in this case. *See Matter of [Redacted]*, 2014 WL 4114100, at *5 (AAO May 29, 2014) (unpub.); *Matter of [Redacted]*, 2009 WL 1742398, at *16 (AAO March 6, 2009) (unpub.).

assets through lawful means, not that Zhou failed to show she acquired hers lawfully. *See* CAR 867–68 (noting Zhou "failed to demonstrate" that "Wu's funds . . . were acquired from lawful means"); CAR 871 (noting Zhou "failed to provide documentary evidence of the path of Mr. Wu's earned income" to his "Hong Kong account").[14]  As explained above, because Wu did not invest any capital in the NCE, USCIS's insistence that Zhou prove the lawful source of Wu's assets and trace the path of his funds was based on an incorrect interpretation of the regulation. *See Battineni*, 2024 WL 4367522, at *14 ("USCIS's denial was based entirely on its unjustified and unreasonable interpretation of the regulations and case law that the 'source of funds' requirement requires a petitioner to trace [his funds] to a lawful source beyond the petitioner's immediate source of funds.").  Thus, it was arbitrary and capricious.

*       *       *

The Court is mindful of USCIS's concern about "money laundering of funds" used in the EB-5 program.  ECF No. 26 at 22 n.4.  But the regulation required Zhou only to show that she obtained her money lawfully, so denying the petition for failing to show how Wu obtained his funds conflicted with its language and was thus arbitrary and capricious.

### B.    Remand Is the Proper Remedy

Although the Court sides with Zhou on her arbitrary-and-capricious claim, the Court will not "order [USCIS] to reopen and approve" her petition.  ECF No. 24 at 33.

"If the record before the agency does not support the agency's action, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or

---

[14] USCIS also did not say (and does not argue in its briefing) that it demanded evidence showing that Wu acquired his assets lawfully because that somehow sheds light on whether Zhou did so as well.  And the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) (citation omitted).

explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  That is especially true

"'in the field of immigration,' where 'there may be sensitive issues lurking that are beyond the ken

of the court.'"  *Huashan Zhang*, 344 F. Supp. 3d at 60 (quoting *Fox v. Clinton*, 684 F.3d 67, 80

(D.C. Cir. 2012)).  The "normal remedy" instead is to "vacate [USCIS's] decision and remand it

for reconsideration."  *Battineni*, 2024 WL 4367522, at *17 (vacating after concluding agency ac-

tion was arbitrary and capricious); *see also Siqing Wang*, 366 F. Supp. 3d at 124 (same).

While Zhou, understandably, fears "further delay," ECF No. 29 at 14, the Court "is not

generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its

own conclusions based on such an inquiry."  *Fla. Power & Light Co.*, 470 U.S. at 744.  But that is

what Zhou would have the Court do to justify directing USCIS to grant her petition.  Zhou also

contends the agency might "come up with an entirely new basis for denial."  ECF No. 29 at 14.

But the agency may, on remand, "reopen the administrative record," "engage in additional fact-

finding," "supplement its explanation," and "reach the same or a different ultimate conclusion."

*Doe v. USCIS*, 239 F. Supp. 3d 297, 309 (D.D.C. 2017).  Should USCIS deny her petition again,

Zhou may seek review and raise whatever claims she deems appropriate.

## IV.    Conclusion

For all the above reasons, the Court will grant in part Zhou's Motion for Summary Judg-

ment, deny USCIS's Motion for Summary Judgment, vacate USCIS's denial of the petition, and

remand to the agency for reconsideration consistent with this Memorandum Opinion.  A separate

order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 6, 2025